AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Middle District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| FABIO LUIS VALDARNINI | ) | Case No. |
| | ) | 6:18-mj- 1069 |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ January 31, 2018 _____ in the county of _____ Orange _____ in the _____ Middle _____ District of _____ Florida _____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1029(a)(4) | Possession of access device making equipment with intent to defraud. |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Dana L. Chmiel, Senior Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **2-1-2018**

_____
*Judge's signature*

City and state: _____ Orlando, Florida _____

THOMAS B. SMITH, United States Magistrate Judg
*Printed name and title*

**STATE OF FLORIDA**

**COUNTY OF ORANGE**

6:18-mj-1069, 1070
1071, 1072

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND SEARCH AND SEIZURE WARRANT

I, Dana L. Chmiel, being duly sworn, depose and state as follows:

1.      I am a Senior Special Agent ("SSA") of the United States Secret Service and have been so employed since 2001. I am currently assigned to the Orlando Field Office. Among my duties as a SSA, I am charged with the investigation of financial crimes, including check fraud, identity fraud, credit card fraud, bank and wire fraud, and the manufacturing, possession and passing of counterfeit United States currency.

2.      The facts set forth in this affidavit are based on my own personal knowledge, knowledge that I obtained from other law enforcement officers, my review of documents and computer records related to this investigation, communications with others who have personal knowledge of the events and circumstances described herein (including participants), and information gained through my training and experience and the training and experience of others. This affidavit does not set forth each and every fact that I or others have learned during the course of the investigation, but rather, sufficient information to establish probable cause.  The offense and conduct described herein took

1

place in Lake Buena Vista, in Orange County, Florida, in the Middle District of Florida.

3.      I make this affidavit in support of a criminal complaint against **FABIO LUIS VALDARNINI ("VALDARNINI")** for a violation of 18 U.S.C. § 1029(a)(4) (possession of access device making equipment with intent to defraud). I also make this affidavit in support of a search warrant authorizing the examination of three electronic devices and the extraction from that property of the electronically stored information described in Attachment D.

<u>**IDENTIFICATION OF THE DEVICES TO BE EXAMINED**</u>

4.      The property to be searched, all of which is currently located at 390 North Orange Avenue, Suite 1300, Orlando, Florida, in the possession of the United States Secret Service ("USSS"), is the following:

     a.  Black and silver skimming device, Model No. MSR X6, hereinafter "**VALDARNINI'S** Device No. 1" (identified below in Attachment A).

     b.  Apple iPhone, in a white protective case, hereinafter "**VALDARNINI'S** Device No. 2" (identified below in Attachment B).

    c.  Purple HP Stream notebook computer, Serial No.

        5CD7525DZ4, hereinafter "**VALDARNINI'S** Device No. 3,"

        (identified below in Attachment C).

    5.    The applied-for search warrant would authorize the forensic examination of **VALDARNINI'S** Devices Nos. 1-3 for the purpose of identifying electronically stored data particularly described in Attachment D. **VALDARNINI'S** Devices Nos. 1-3 are currently in the lawful possession of the USSS, which seized Devices Nos. 1-3 incident to **VALDARNINI'S** arrest. **VALDARNINI'S** Devices Nos. 1-3 have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when they first came into the possession of the USSS.

**DETAILS OF INVESTIGATION**

    6.    My involvement in this case originated on January 31, 2018, when I was contacted by Investigator William Sims of Walt Disney World Resorts. Investigator Sims stated that investigators at Walt Disney World Resorts became aware of multiple suspicious purchases that had been made at Disney Springs with an American Express credit card number ending in 5005. Investigator Sims stated that his investigation revealed that this same credit card was utilized to pay for approximately two weeks of lodging in room

3

number 1618 at Disney's Art of Animation hotel. Investigator Sims stated that

he contacted the American Express Merchant Fraud Hotline through which he

was able to confirm that the purchases made at Disney Springs using the

American Express credit card number ending in 5005 were in fact fraudulent.

Investigator Sims stated that Disney's Art of Animation hotel immediately put

a hold on the American Express credit card number ending in 5005 and

attempted to make contact with the hotel guests in room 1618, who, based on

the reservation details were still staying in that room at the hotel.

      7.     Investigator Sims stated that at approximately noon that same

day (January 31, 2018), he and Disney Investigator Cheryl Regiacorte

responded to Disney's Art of Animation hotel to make contact with the hotel

guest and to conduct a security and wellness check of room 1618 as prescribed

by Walt Disney World Resort policy.  Investigators Sims stated that they

arrived at room 1618 and knocked on the door, but that no one answered the

door, and that the room thus seemed to be unoccupied. Per Walt Disney

World Resort policy, Investigators Sims and Regiacorte utilized a master key

to enter the room, at which time they observed based on the contents of the

room, including luggage, that there appeared to be guests staying in the room

but that none of them were in the room at that time. Investigator Sims stated

that while conducting the security and wellness check of the room, he and

4

Investigator Regiacorte observed what they believed to be multiple access devices throughout the room.  Investigators Sims and Regiacorte thus immediately contacted the United States Secret Service for assistance.

8.     Investigator Sims further stated that prior to entering the room, Disney investigations had the room locked down so that its occupants would not be able to renter using their existing key cards.

9.     At approximately 3 p.m. that same date, I responded to Disney's Art of Animation hotel, made contact with Disney Investigator Regiacorte, and discussed with her the details provided to me by Investigator Sims. Investigator Regiacorte informed me that American Express credit card number ending in 5005 had been used to make fraudulent purchases amounting to approximately $5,000, and that the Disney Investigators had asked American Express to place a hold on the credit card to prevent further losses.  Investigator Regiacorte requested that I accompany her and hotel management to room 1618 while they made another attempt to make contact with the hotel guest and confirm the presence of the access devices in the room.

10.     When we arrived at room 1618, Investigator Regiacorte knocked on the door but no one answered. Per Walt Disney World Resort policy Investigator Regiacorte utilized a master key to enter the room.  I accompanied Investigator Regiacorte, as well as Disney hotel management, into the room.  I

was able to observe that belongings of approximately two individuals were in the room, but I did not search the contents of any of these belongings.

11.     A short time later, four unknown Hispanic males, later identified as **VALDARNINI**, A.C., S.S., and A.F., attempted to enter room 1618, at which time I made contact with them and asked them to identify themselves. None of the four Hispanic males appeared to speak English. At that time two of the Hispanic males, later identified as S.S. and A.F., attempted to flee, but were stopped by hotel management. Out of concern for the safety of myself, Investigator Regiacorte, and the hotel management, I ordered the four Hispanic males to sit down in the living room area of room 1618. At that time, I identified myself and quickly determined that the four Hispanic males were Brazilian and that their native language was Portuguese. With the assistance of a Spanish speaking hotel staff member with whom we communicated via telephone, I was able to communicate to all four Hispanic males that I wanted them to empty their pockets and place any items from their pockets on the coffee table in the living room. As the four Hispanic males emptied items from their pockets, I observed that **VALDARNINI** removed from one of his pockets an Apple iPhone in a white protective case (**VALDARNINI'S** Device No. 2).

12.     At that time, **VALDARNINI** lunged forward and attempted to quickly unplug the power cord from the laptop (**VALDARNINI'S** Device No.

6

3) that was sitting on the coffee table and remove the laptop from the coffee table, at which time I ordered him not to touch the laptop.

13.    With the assistance of the Spanish-speaking hotel staff member on the telephone, I ordered the four Brazilian males to provide identification. At that time, **VALDARNINI**, A.C., and A.F. provided me with Brazilian driver's licenses which had characteristics of counterfeit licenses. (S.S. did not have any identification with him at that time). Recognizing **VALDARNINI'S** name from the luggage tag on the silver hard-sided luggage in the bedroom, I asked **VALDARNINI** for his passport. Through the Spanish-speaking hotel staff, **VALDARNINI** stated his passport was in his luggage, which he positively identified as the silver hard-sided suitcase in the bedroom. I asked him if I could retrieve the luggage from the bedroom and he agreed.  I retrieved the suitcase from the bedroom and carried it into the living room, at which time **VALDARNINI** confirmed that I had the correct bag. While I was attempting to place the partially opened luggage down, the suitcase completely opened up and fell onto the floor, exposing the contents of the suitcase. At that time, I observed in plain view a small black and white paper bag containing a black and silver device that I immediately recognized to be a credit card skimming device (**VALDARNINI'S** Device No. 1), together with what appeared to be dozens of credit cards.  I asked **VALDARNINI** where in the

suitcase his passport was, at which time he pointed to a specific pocket of the suitcase. I retrieved the passport, which **VALDARNINI** confirmed was his. This passport displays **VALDARNINI'S** full name as well as his photograph, and indicates that his date of birth is XX.XX.1987.

14. At approximately 4 p.m. that same date, Assistant to the Special Agent In Charge Roy Dotson, Senior Special Agent Roger Fuentes, and Special Agent Donna Tyus, all from the USSS, arrived to assist me with the investigation, at which time I discussed the details of this case with each of them. SSA Fuentes, a competent Portuguese speaker, was able to communicate with **VALDARNINI**, A.C., S.S., and A.F., and confirm each of their identities. SSA Fuentes also confirmed that **VALDARNINI** and A.C. were the actual occupants of room 1618.

15. In anticipation of questioning **VALDARNINI** regarding the fraudulent credit card activity associated with the credit card ending in 5005 used to pay for room 1618, SSA Fuentes advised **VALDARNINI** of his Miranda rights in Portuguese. At that time, **VALDARNINI** invoked his

Miranda rights and requested to speak to a lawyer. At that time, all questioning ceased.

## TECHNICAL TERMS

16.     Based on my training and experience, I use the following technical terms to convey the following meanings:

  a. Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on

personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage

media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected

to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.   PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include GPS technology for determining the location of the device.

f.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the

structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

17. Based on my training, experience, and research, I know that **VALDARNINI'S** Device No. 2 has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

18. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, information that has been viewed via a device is often stored for some period of time on the device. This information can sometimes be recovered with forensic tools.

19. There is probable cause to believe that things that were once stored on a device may still be stored there, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage

13

medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application

14

operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

20. *Forensic evidence.* As further described in Attachment D, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described in the warrant, but also forensic evidence that establishes that the devices were used, the purpose of their use, who used them, and when. Based on my experience and training, there is probable cause to believe that such forensic electronic evidence might be on **VALDARNINI'S** Devices Nos. 1-3, each of which contain electronic storage mediums, because:

a. Data on an electronic storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file. Virtual memory paging systems can leave traces of information on the storage

15

medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and "chat" programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times a computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.  Forensic evidence on electronic devices can enable forensic examiners to draw conclusions about whether the electronic devices were used, the purpose of their use, who used them, and when. The search for "user attribution" evidence on an electronic device is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can merely be reviewed by examiners and

16

passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

d. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

e. I know that when an individual uses an electronic device in the commission of access device fraud, such as obtaining stolen credit card numbers and pin numbers, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. An electronic device used to commit a crime may contain data that is evidence of how the

17

electronic device was used, data that was sent or received, and other records that indicate the nature of the offense.

f.  Based on my training and experience, skimming devices often contain additional types of evidence that can lead investigators to suspects:

    i.  Circuit boards that hold the electronic components for skimming devices (the material on which parasitic microprocessors and other parts are mounted) often have a fabricator's name or logo stamped or silk-screened onto the board. Criminals who mass-produce these boards often pay a commercial circuit board fabricator to do so. Often, the fabricator will include its logo, company name, and most importantly a "run number" or "order number" on the board. This can lead investigators to suspects.

    ii.  Skimming devices also often contain components such as integrated circuits and microprocessors that have manufacturing codes printed on them.  Electronics professionals are able to use such codes to determine the date and location of a part's manufacture. Using these codes it also may be possible to determine where the part

was sold. This can help investigators locate the specific supplier of the part, again leading to suspects, as some of the parts used in skimming and overlay devices are not very common.

iii. Skimming devices are constructed around microcontrollers—miniature computers on a chip. Computers need software (in this case called "firmware") in order to run. The firmware stored within these systems does the work of intercepting and storing customer data for later retrieval by the suspects. This firmware can often be retrieved from a skimming device by electronics and computer system professionals and examined for clues as to its originators. As with physical hardware, the type and efficiency of firmware is evidence of the nature of the suspects.

g. In addition, based on my training and experience, criminals often utilize cellular telephones, such as **VALDARNINI'S** Device No. 2, to facilitate communication with suppliers and co-conspirators and to store telephone numbers and addresses of associates. Such telephones are also likely to be a storage medium for evidence of

19

a crime.  For instance, cellular telephones like **VALDARNINI'S** Device No. 2 are capable of storing historical toll activity, listings, electronic mail (e-mail), text messages, billing information, and personal notes. Further, criminals often maintain messages left on a cellular telephone's answering service. Records of communications between criminals and their associates might indicate, among other things, how they acquired access-device making equipment and what they intend to do with such equipment in the future.

h.  In addition, some models of cellular telephones, such as **VALDARNINI'S** Device No. 2, also function as digital cameras capable of capturing and storing digital still images (pictures) or videos.  In my experience, I have known criminals to store photographs of evidence of access device fraud in their cellular telephones. As noted above, some models of cellular telephones, such as **VALDARNINI'S** Device No. 2, are also equipped with technology allowing mobile tracking, data plotting, or mapping through the use of satellite Global Positioning Systems (GPS).

21.  *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, the search

20

warrant I am applying for would permit the examination of **VALDARNINI'S**

Devices Nos. 1-3 consistent with the warrant. The examination may require

authorities to employ techniques, including, but not limited to, computer-

assisted scans of the entire medium, that might expose many parts of the device

to human inspection in order to determine whether it is evidence described by

the warrant.

22.    *Manner of execution.*  Because the search warrant I am applying for

seeks only permission to examine devices already in law enforcement's

possession, the execution of this warrant does not involve a physical intrusion

onto any premises. Consequently, I submit that there is reasonable cause for

the Court to authorize execution of the warrant at any time in the day or night.

Based on the foregoing, I further request that the warrant be deemed executed

upon the taking of the first step in the analysis by a forensic examiner (such as

imaging the contents of the devices).  I also request that further analysis of

**VALDARNINI'S** Devices Nos. 1-3 be permitted at any time thereafter,

including more than 14 days after the signing of the warrant.

**CONCLUSION**

23.    Based on the foregoing, I submit that probable cause exists to

believe that **VALDARNINI'S** Devices Nos. 1-3 contain evidence of violations

of 18 U.S.C. §§ 371 (Conspiracy to commit offense or to defraud United

21

States), 1028 (Fraud and related activity in connection with identification documents, authentication features, and information), 1029 (Fraud and related activity in connection with access devices), or 1343 (Fraud by wire, radio, or television). Therefore, I request the issuance of a search warrant authorizing the examination of **VALDARNINI'S** Devices Nos. 1-3 (described in Attachments A through C) and the seizure of fruits, evidence, and instrumentalities of these crimes as described in Attachment D.

24.     I also submit that there is probable cause to support the issuance of an arrest warrant and criminal complaint charging **VALDARNINI** with a violation of 18 U.S.C. § 1029(a)(4), possession of access device making equipment with intent to defraud.

DANA L. CHMIEL,
SENIOR SPECIAL AGENT
UNITED STATES SECRET SERVICE

Sworn and subscribed before me
this ___ day of February, 2018.

THOMAS B. SMITH
UNITED STATES MAGISTRATE JUDGE

22